

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHER DISTRICT OF ILLINOIS
## EASTERN DIVISION

KURT SCHILLER,                          )
                                        )
        Plaintiff,                      )
                                        )       Case No. 1:11-cv-02387
        v.                              )
                                        )       Magistrate Judge Jeffrey Cole
MICHAEL J. ASTRUE, Commissioner         )
of Social Security,                     )
                                        )
        Defendant.                      )

## MEMORANDUM OPINION AND ORDER

The plaintiff, Kurt Schiller, seeks review of the final decision of the Commissioner of the Social Security Administration ("Agency") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1382c. Mr. Schiller asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Mr. Schiller applied for SSI on June 22, 2007, alleging that he had been disabled since December 31, 2003. (Administrative Record ("R.") 18). His application was denied initially and upon reconsideration. (R. 112, 127). Mr. Schiller continued pursuit of his claim by timely filing a request for a hearing on June 16, 2008. (R. 130).

An ALJ held a hearing on September 30, 2009. (R. 35-105). Mr. Schiller, represented by counsel, appeared and testified. (R. 35-68). Plaintiff's father, Sam Schiller, and fiancé, Anastatsia Johnson, also testified at the hearing. (R. 35, 69-85). In addition, Grace Gianforte testified as a vocational expert. (R. 35, 85-104). On November 12, 2009, the ALJ issued a

decision denying Mr. Schiller's application for SSI because he could perform light work that existed in significant numbers in the regional economy. (R. 18-29). This became the final decision of the Commissioner when the Appeals Council denied Mr. Schiller's request for review of the ALJ's decision on February 8, 2011. (R. 1-5). *See* 20 C.F.R. §§ 404.955, 404.981. Mr. Schiller has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE

### A.
### Vocational Evidence

Mr. Schiller was born April 12, 1983, making him twenty-six years old at the time of the ALJ's decision. (R. 44). He has a high school education. (R. 44-45). His work history over the last fifteen years consists of a wide variety of jobs, including construction demolition, telemarketing, Quizno's, Target where he unloaded trucks and stocked shelves, and a car wash. (R. 45-46, 260-68). He usually gets fired from the jobs because he stops showing up. (R. 225).

### B.
### The Medical Evidence

#### 1.
#### The Plaintiff's Neurologist

Mr. Schiller suffers from multiple medical problems, including seizures, depression and anxiety. Mr. Schiller began seeing Dr. Helge G. Frank, M.D., in July 2006 for his seizures. (R. 543). In his initial report, Dr. Frank noted that Mr. Schiller was off Dilantin for eight or nine months prior to the examination and that Mr. Schiller was not having any problems. (R. 543). Dr. Frank further noted he did not "think there's any reason for [Mr. Schiller] to continue on any

seizure medicines at this time." (R. 545). However, Dr. Frank stated that the prognosis is guarded due to "the high rate of recidivism with this problem." (R. 545).

Mr. Schiller continued to see Dr. Frank intermittently. In two visits during 2007, Dr. Frank opined that Mr. Schiller's seizures "seem to be doing well" and that the seizures were "fairly well controlled" on the regimen of Dilantin and Ativan. (R. 640). Mr. Schiller did not visit Dr. Frank for eleven months. (R. 640). At the Plaintiff's visit in June 2008, Dr. Frank recorded that the Plaintiff was "doing better" and had not suffered any seizures. (R. 640). However, Dr. Frank did note that the Plaintiff complained of a new symptom of "bifrontal sharp headaches that start in the afternoon and evening." As a result of Mr. Schiller's complaint, Dr. Frank ordered an MRI scan. (R. 640). Dr. Frank saw Mr. Schiller three months later in September 2008, and noted that Mr. Schiller's seizures were well controlled on his medication, his headaches were "much improved" on Zonegran, and his exam was "benign." (R. 639).

Mr. Schiller's last visit to Dr. Frank came in April 2009. (R. 639). At this time Dr. Frank noted that the seizures had "been only modestly controlled. [Mr. Schiller] describes a lot of myoclonus at night . . . some episodes of confusion and disorientation preceded by some 'twitching' . . . [and] his headaches have also been bad at times with 'blinding headaches' at times." (R. 639). Mr. Schiller asked Dr. Frank about the possibility of going on disability. (R. 639). In response, Dr. Frank noted that he was "not quite sure what the reason would be, but [Mr. Schiller] can apply for it." (R. 639).

Nearly six months after Mr. Schiller's last visit, Dr. Frank completed a residual functional capacity ("RFC") form. (R. 642-45). Dr. Frank listed the Plaintiff's diagnoses as an uncontrolled seizure disorder and mixed cephalalgia, writing that his prognosis was guarded. (R. 642). Concerning the questions about headaches, Dr. Frank opined that Mr. Schiller had

3

moderate to severe headaches, that the frequency of the headaches varied, that they would last 6-12 hours and that in order to make the headaches better Mr. Schiller should take medication and lie down in a dark and quiet room. (R. 642-43).

Dr. Frank then opined that Mr. Schiller (1) suffered from 4-6 seizures per month; (2) there is loss of consciousness; (3) his typical episode lasted minutes; (4) he could not always take safety precautions when he feels a seizure coming on; and (5) following the seizure, he suffered confusion, exhaustion, irritability, severe headache, and muscle strain, which could last for several hours. (R. 643-44). However, Dr. Frank was unable to list the dates of Mr. Schiller's last three seizures. (R. 643). Dr. Frank also listed Mr. Schiller's psychological conditions that affect his physical condition as depression, anxiety and somatoform disorder. (R. 644).[1]

Dr. Frank stated in the RFC questionnaire that Mr. Schiller would need unscheduled breaks for "several hours," but he did not know how often the Plaintiff would need these breaks. (R. 645). He stated that the Plaintiff could never work around moving surfaces or machinery, work at heights or climb ladders, but he could occasionally climb stairs. (R. 645). Dr. Frank assessed that Mr. Schiller would miss more than four days per month as a result of his impairments. (R. 645).

## 2.
## The Plaintiff's Treating Social Worker

Mr. Schiller saw his treating social worker, Mr. Mark MacDonald, LCSW,[2] from January 2003 to February 2004, and then began visiting him again in March 2007. (R. 448, 627). Mr. MacDonald submitted an RFC assessment, noting that Mr. Schiller "cycles through frequent periods of depression and anxiety," which are displayed by the Plaintiff getting overwhelmed by

---

[1] On at least two separate occasions, Dr. Frank noted in his medical records that Mr. Schiller was only being "followed" for a seizure disorder. (R. 639-40).

[2] He is referred to as Mr. McDonald in the parties' briefs but the record indicates the correct spelling is MacDonald.

simple tasks. (R. 627). He opined that Mr. Schiller has marked limitations in daily living activities and concentration, persistence or pace, with extreme limitations related to social skills. (R. 628). Additionally, Mr. MacDonald noted that, as a result of his impairments, the Plaintiff will likely be absent from work more than three days per month and that he will need to take more than three breaks per day with each break lasting forty-five to ninety minutes. (R. 629). Lastly, Mr. MacDonald opined that Mr. Schiller "wants to be productive, but has so many impairments, they hinder him from . . . maintain[ing] steady employment." (R. 632).

Mr. MacDonald's progress notes regarding the Plaintiff are somewhat different from the RFC assessment that he filled out. He notes on several occasions that Mr. Schiller was working at various jobs. (R. 615, 619-22, 625). In fact, the progress notes indicate the Plaintiff worked after he filed for SSI at the car wash six to seven days a week, six to eight hours a day, for over a month without missing a day of work. (R. 620). Mr. MacDonald and Mr. Schiller also discussed Mr. Schiller applying for and wanting jobs multiple times. (R. 616-17, 619, 623-34). Once, Mr. MacDonald noted that the Plaintiff's parents were hassling him about getting a job, while another time Mr. Schiller stated that he was busy with his dad and doing more than ever. (R. 618, 621).

Other significant notes in the records kept by Mr. MacDonald include Mr. Schiller having "no interest in working while taking care of [his daughters] . . ."; and on a separate occasion not taking his medications, which resulted in him suffering increased twitching. (R. 624-25).

### 3.
### Consultative and Reviewing Physicians

Dr. Young-Ja Kim, M.D., a non-examining State agency doctor completed a physical RFC assessment in September 2007. (R. 449-456). Dr. Kim assessed that Mr. Schiller could frequently lift ten pounds and occasionally lift twenty pounds. (R. 450). Further, Dr. Kim

opined that Mr. Schiller should never climb ladders, ropes or scaffolds due to his seizures, but could climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. 451). Lastly, Dr. Kim noted that the Plaintiff's symptoms were attributable to a medically determinable impairment and that her RFC assessment was consistent with the total medical and nonmedical evidence. (R. 454).

Dr. Jerrold Heinrich, Ph.D., issued an opinion as a State agency non-examining psychologist. (R. 557-574). Dr. Heinrich opined that the paragraph B limitations for Mr. Schiller were mild limitations of his daily functions and maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation lasting for an extended duration. (R. 567, 571). He noted that Mr. Schiller's mother and father reported that he had a part time job, watches his two infant children, can do household chores for a short time but cannot stay on task, and has no problems with personal care or cooking meals. (R. 569). Further, Dr. Heinrich listed the Plaintiff as moderately limited in his ability to respond appropriately to changes in the work setting and his ability to set realistic goals or make plans independently of others. (R. 572). Lastly, he noted that the Plaintiff can "understand, remember, and execute simple instructions . . . concentrate and persist adequately on tasks within an organized setting," and adjust to routine changes as long as they are not frequent. (R. 573).

**C.**
**Administrative Hearing Testimony**

**1.**
**Plaintiff's Testimony**

Mr. Schiller stated he cannot handle working full-time because he does not want to get out of bed, and all of the side effects from his medications make it very difficult to consistently

work. (R. 46). Mr. Schiller testified that his positions at Target and the car wash were full-time but that he lost both jobs because he could not handle them, slowly decreased the hours that he worked, and finally stopped showing up to work altogether. (R. 46).

Plaintiff testified that he has seizures four to six times a month, "lately," in spite of taking his proscribed medication (R. 47-48). The only warning he has before suffering a seizure is that his arm starts twitching a lot, followed by his body jerking. (R. 48). His seizures can occur during the day or at night. (R. 48). The seizures last between forty-five and ninety minutes. Following a seizure he is exhausted, has some memory loss, and is "really irritated" for a couple of hours. (R. 49). He has suffered seizures while taking care of his children; however, each time he starts twitching prior to the seizure so he is able to call people and get someone to look after the kids while he goes to the hospital. (R. 54). He is also aware of when he has seizures while he is sleeping because in the morning he might have a headache or will not remember what happened the night before. (R. 64).

Mr. Schiller testified his depression symptoms include: (1) stating that he hates himself five to ten times a day; (2) not wanting to get out of bed in the morning; (3) not wanting to go anywhere; and (4) just wanting to be left alone. (R. 51). Mr. Schiller testified that he does not want to get out of bed twice a week if it is a good week, while if he is suffering a bad week then he does not want to get out of bed or leave the house five days a week. (R. 61). He also suffers panic attacks and gets overwhelmed a few times a day when under a lot of stress. (R. 52-53).

The Plaintiff stated that he has trouble concentrating and remembering things. He loses track of what he is trying to say, he needs reminders to do things and has trouble completing a task on time. (R. 57, 62). For example, he has a reminder in his phone so that he remembers to

take his daughter to school and pick her up from school. (R. 57). Although Mr. Schiller needs some reminders, he does not need any reminders to do chores around the house. (R. 59).

Contrary to the reports he filed with Social Security, Mr. Schiller testified that he essentially quit his prior jobs because he just stopped going. (R. 63). He is so embarrassed about missing work and then not showing up again, that he has never been back to a place where he was employed. (R. at 64).

## 2.
### Plaintiff's Father's Testimony

Sam Schiller ("Plaintiff's father") testified about how he helps his son with daily activities and his general observations of his son's ailments. (R. 69-82). The Plaintiff's father provides assistance to his son when he becomes overwhelmed and gives Mr. Schiller advice on raising the children. (R. 69). The Plaintiff's father reminds him about doctors' appointments, needing to change the oil in the car and other "odds and ends." (R. 70).

The Plaintiff's father testified that Mr. Schiller has trouble accomplishing tasks because he will put them off or not start them because he thinks they are too difficult or because other things take precedence over that task. (R. 70). Further, he stated that Mr. Schiller's previous jobs consisted of boring, "repetitious-type" jobs where the Plaintiff would put things off because he either did not want to do them or did not want to get up early in the morning. (R. 71). Additionally, when in school, the Plaintiff would be doing quite well but then would stop showing up, resulting in him failing the classes. (R. 72).

The Plaintiff's father stated that he had seen some of his son's seizures and that they are "very scary." (R. 74). He has also seen some of the twitching episodes that his son suffers from. (R. 74). The Plaintiff's father does not know how often his son's seizures occur, only that they happen "more frequently" than he would like. (R. 75).

When the Plaintiff's fiancé was working, the Plaintiff's father would assist the Plaintiff in taking care of the children; the frequency varied from every day to once or twice a week. (R. 75). The Plaintiff's father testified that he and his wife would sometimes volunteer to take the children and sometimes Mr. Schiller and his fiancé asked for the help. (R. 76). In the weeks leading up to the hearing, the Plaintiff's father estimated that he helped with the children two to three times a week. (R. 80). Lastly, he admitted that he would not be around his grandchildren nearly as much "if it wasn't for the crisis." (R. 79).

### 3.
### Plaintiff's Fiancé's Testimony

Anastasia Johnson ("Plaintiff's fiancé") testified that Mr. Schiller suffers seizures, on average, three to four times a month. (R. 82). Following the seizures Mr. Schiller is very tired and does not know what happened the night or perhaps day before. (R. 83). His medication and seizures cause him to be tired which results him not wanting to play with his daughters and staying in bed all of the time. (R. 83). She also testified that the Plaintiff is quite irritable and will "snap off the hinges" a couple of times per day. (R. 85). Finally, the Plaintiff's fiancé stated that when she asks Mr. Schiller to do something he will wait and accomplish what he wants prior to helping her because he does not think her requests are as important. (R. 84).

### 4.
### Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE") to consider an individual with the same age, education and work experience as Mr. Schiller, who (1) could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but should never climb ladders, ropes or scaffolds, or work near hazards; (2) they can also understand, remember and carry out simple, routine and repetitive tasks, but should not work in close proximity of others in order to

minimize distractions; (3) can adjust to routine changes so long as they are not frequent; (4) needs reminders from supervisors four times per day; and (5) should work in an environment that does not have quotas. (R. 88). The VE testified that there are occupations that this hypothetical individual could perform but the reminders requirement was an adverse factor and there are no jobs that the individual could perform. (R. 88). Additionally, if only two reminders were required this would be acceptable during the first week or two of work but would not likely be acceptable on a continued basis because people are expected to work independently in competitive gainful employment. (R. 89). The VE testified that if the reminder requirement is struck altogether then the individual could perform light unskilled jobs such as a warehouse checker, cafeteria attendant and stock checker. (R. 90).

Mr. Schiller's attorney then asked the VE to consider the original factors but to also include anger outbursts. (R. 93). The VE testified that there would be no jobs because an employer would not accommodate that. (R. 94). In response to further questioning, the VE testified that a seizure where an individual loses consciousness is an adverse factor, as is a seizure that poses a danger to other employees. (R. 94). Finally, the VE explained that it would be an adverse factor if an individual had to take unscheduled breaks during the work day. (R. 98).

### III.
### THE ALJ'S DECISION

The ALJ found that Mr. Schiller had not engaged in substantial gainful activity since his application date of June 22, 2007. (R. 20). She also found that Mr. Schiller suffered from the following severe impairments: seizure disorder, depression, and history of drug abuse with repeated relapses. (R. 20). The ALJ reasoned that the impairments or a combination of the

impairments did not meet or medically equal one of the listed impairments. (R. 21). Based on her review of the entire record, the ALJ concluded that Mr. Schiller's residual functional capacity permitted him to perform light work with the restrictions of never climbing ladders, ropes or scaffolds, and avoiding concentrated exposures to hazards; additionally, he should not work in close proximity to others in order to minimize distraction. (R. 22). She also concluded that Mr. Schiller was capable of frequently climbing ramps and stairs; he was able to balance, stoop, kneel, crouch and crawl; he can understand, remember and carry out simple, routing and repetitive tasks; he has no limitations on his ability to interact with others; and he can adjust to infrequent routine changes in his environment. (R. 22-23).

The ALJ concluded that Mr. Schiller's medically determinable impairments could reasonably be expected to cause his symptoms, but his statements concerning the intensity, persistence and limiting effects were not fully credible because they were inconsistent with the RFC assessment. (R. 23-24). The ALJ based her assessment of Mr. Schiller's credibility on the objective medical evidence, medical treatment, medications taken, activities of daily living, and his work history. The ALJ reasoned that Mr. Schiller's medication appeared to be working and that it controls his symptoms; however, he has problems when he is non-compliant with taking his medication. (R. 24). Further, there were no records of recent hospital visits, "which suggests he is doing better." (R. 24).

The ALJ assigned great weight to the State agency assessment of Mr. Schiller's capabilities and the psychiatric review of the mental RFC assessment because they were consistent with the medical evidence as a whole. (R. 26). She assigned little weight to Dr. Frank's opinion because of inconsistencies between the medical records that he kept and the

questionnaire he filled out. (R. 26-27).[3] The ALJ gave little weight to Mr. MacDonald's opinion for similar reasons. (R. 27).

After determining Mr. Schiller's RFC, the ALJ determined that he had no past relevant work. (R. 27); *see* 20 C.F.R. 416.965. The ALJ then considered his age, education and experience and applied the framework provided by the Medical-Vocational Guidelines. (R. 28); *see* 20 C.F.R. pt. 404, subpt. P, App. 2. She found that the Plaintiff could not perform the full range of light work because he was impeded by additional limitations. (R. 28). In order to determine how the limitations affected the unskilled light occupational base, the ALJ turned to the VE's testimony where the VE considered an individual with the same RFC, age, education and experience as Mr. Schiller. (R. 28). Based on the VE's testimony that jobs were available to such an individual, the ALJ reasoned that the Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 28). Thus, the ALJ concluded that a finding of "not disabled" was appropriate under the Medical-Vocational Guidelines. (R. 28).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion v. Chater*, 108

---

[3] The inconsistencies and other reasons for this decision are discussed *infra*.

F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility of resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The ALJ must "minimally articulate" her analysis of the evidence. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An ALJ need not address every piece of evidence or testimony, "but must provide some glimpse into her reasoning." *Dixon*, 270 F.3d at 1176 (citing *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001)). In order for the court to affirm a denial of benefits, the ALJ "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176; *Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). The ALJ's decision must allow the court to assess the validity of her findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade; it is a "lax" standard. *Berger*, 516 F.3d at 544-45; *see also Schmidt*, 496 F.3d at 842 (*quoting Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996) ("[S]o long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, [the court] must affirm the ALJ's decision denying benefits.")).

**B.**
**Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a Mr. Schiller is disabled:

> 1) is Mr. Schiller currently unemployed;
> 2) does Mr. Schiller have a severe impairment;
> 3) does Mr. Schiller have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
> 4) is Mr. Schiller unable to perform his past relevant work; and
> 5) is Mr. Schiller unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-12; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step three, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352; *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

**C.**
**Analysis**

Mr. Schiller claims the ALJ erred as to the weight she afforded his treating physician and licensed social worker, the evaluation of his residual functional capacity according to SRR 96-8p, and the evaluation of his credibility under SSR 96-7p. He has thus waived any other arguments he might have made. *Carter v. Astrue*, 413 Fed. Appx. 899, 905 (7th Cir. 2011); *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004); *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 200).

**1.**

Turning to his first argument, Mr. Schiller finds a host of faults with the ALJ's decision to afford Dr. Frank's opinion and Mr. MacDonald's opinion little weight. Some of the criticisms amount to little more than "nitpicking," *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004), or demanding a perfect decision. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). He complains that: (1) the ALJ mischaracterized the evidence; (2) Dr. Frank's opinion was consistent with his assessment at the time he filed it; (3) the ALJ failed to explain how the questionnaire Dr. Frank filled out was generic; (4) the reason for giving Dr. Kim's opinion great weight was "legally insufficient"; and (5) the ALJ should have given greater weight to Mr. MacDonald's opinion.

The arguments concerning Dr. Frank's opinion and medical notes can be analyzed as one. Normally, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek*, 390 F.3d at 503 (citing 20 C.F.R. § 404.1527(d)(2)). "However, while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Schmidt*, 496 F.3d at 842 (quoting *Books*, 91 F.3d at 979 (internal quotations omitted)). The treating physician is not always the most reliable source because they " 'may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.' " *Books*, 91 F.3d at 979 (quoting *Stephens v. Heckler*, 766 F.3d 284 (7th Cir. 1985). Thus, an ALJ may afford less weight to a treating physician's medical opinion if the opinion "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as [the ALJ] minimally articulates his

reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503 (internal quotations and citations omitted).

In this case, the ALJ did provide an adequate explanation of her decision not to give controlling weight to Dr. Frank's opinion and did not mischaracterize the evidence. An ALJ is not only allowed to, but indeed must, weigh conflicting medical evidence and make appropriate inferences from the record. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The ALJ found that the medical evidence in the record did not support Dr. Frank's conclusion about the patient's inability to work. For example, Dr. Frank's progress notes indicate that Mr. Schiller mentioned to Dr. Frank that he was going to apply for disability. (R. 639). In response, Dr. Frank questioned the Plaintiff's need to go on disability because he had been doing well. (R. 639). Further, contrary to his progress notes and without seeing the plaintiff after he made the comment about disability, Dr. Frank filled out a RFC assessment five months later in which he opined that the Plaintiff could not work and suffered four-to-six seizures per month and as a result Mr. Schiller would miss more than four days of work per month. (R. 642-45). The ALJ found this statement:

> interesting for three reasons: (1) it suggests the claimant's symptoms and conditions are not as severe as the claimant believes; (2) it minimizes the credibility and strength of the prior questionnaire filled out by Dr. Frank and (3) as the disability form was filled out after the claimant expressed interest to Dr. Frank in seeking disability, [the RFC assessment] appears to be a mere accommodation of the claimant and his disability claim.

(R. 26). This was a reasonable inference given the doctor's previous skepticism regarding Mr. Schiller's interest in disability; not unfounded speculation of *Moss*. *Henke v. Astrue*, No. 12-2364, 2012 WL 6644201, at *3 (7th Cir. Dec. 21, 2012) ("[T]he ALJ need not blindly accept a treating physician's opinion—she may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record."); *Schmidt*, 496 F.3d at 842. The ALJ also

noted that she "would not expect to see such a drastic change in opinion in such a short period of time without medical support." (R. 26). She also noted that the RFC questionnaire that Dr. Frank filled out was a "bit generic" because he did not explain or indicate why he thought such limitations were necessary for Mr. Schiller; a valid fault with the questionnaire. The ALJ found that these inconsistencies and lack of information "diminish[ed] the usefulness of [Dr. Frank's] opinion . . ." resulting in her assigning the opinion little weight, as Dr. Frank's opinion was also not supported by the medical evidence as a whole. (R. 26-27). The ALJ's opinion built a "logical bridge" because a reviewing court is able to trace the evidence to her conclusion. *Giles*, 483 F.3d at 486. Therefore, the ALJ "minimally articulated" her reasons for characterizing the evidence as she did, calling Dr. Frank's questionnaire "a bit generic" and declining to afford Dr. Frank's medical opinion "substantial weight," there is no reason to find fault in her determination. *Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008).

In contrast, the ALJ afforded great weight to the opinion Dr. Kim, a non-examining State agency doctor, because it was consistent with the medical evidence as a whole. (R. 26). While the Plaintiff argues that the ALJ did not explain how it was consistent with the record, this was clear from the ALJ's discussion of the evidence. (R. 24). Perhaps the ALJ did not hold the reader's hand as they crossed the "logical bridge," but she did enough. *See, e.g., Schmidt*, 496 F.3d at 943-44 (ALJ's discussion of evidence illuminated his rationale). When reviewing the ALJ's decision "we give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it." *Shramek*, 226 F.3d at 811. "No principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect opinion unless there is a reason to believe that the remand might lead to a different result." *Fisher*, 869 F.2d at 1348 (Posner, J.) ("But if we are sure that the agency would if we remanded the case reinstate its decision—if in other words the

error in its decision was harmless—a reversal would be futile, and [*SEC v.*] *Chenery* [*Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)] does not require futile gestures."). Applying this principle, it is not enough for this court to remand this case for the sole reason of requiring the ALJ to elaborate on her reasoning with regards to Dr. Kim because the decision will be the same. Additionally, the ALJ minimally articulated her reasons for affording Dr. Kim's opinion great weight, as such this court will not nitpick her decision.

Likewise, the ALJ afforded Mr. MacDonald's opinion little weight for much of the same reasons as she explained in her analysis of Dr. Frank's opinion. Mr. MacDonald's notes repeatedly reference talk of Mr. Schiller either holding a job or attempting to find a job, including collecting unemployment. The notes never question or doubt Mr. Schiller's ability to hold employment. The Plaintiff also argues that Mr. MacDonald's opinion should be given the same weight as a medical source and that the ALJ erred in finding that he was not an acceptable medical source. In support of this, Mr. Schiller cites to SSR 06-3p which states that "it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." However, as the ALJ notes, Mr. MacDonald did not provide better supporting evidence or a better explanation. The evidence simply was not there to support his conclusions. Thus, she was not required to give more weight to Mr. MacDonald's opinion. Further, the rule states "may" not "shall" or "must."

**2.**

Mr. Schiller next argues that the ALJ erred in evaluating his residual functional capacity according to SSR 96-8p because she did not determine the frequency of his seizures and whether

the seizures would preclude competitive employment, and she failed to account for the side effects of his medications and headaches.

The RFC assessment is a consideration of things a claimant can physically accomplish in order to determine what types of work can be performed. 20 C.F.R. § 404.1545(a)(1); *Berger*, 516 F.3d at 544. A reviewing court does not reweigh the evidence or substitute the ALJ's analysis with its own when examining the ALJ's RFC determination. *Id.*; *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). If there is substantial evidence to support that decision, the court must affirm the decision of the ALJ. *Schmidt*, 496 F.3d at 841). "Substantial evidence" need not be a preponderance, but it must be more than a mere scintilla. *Id.* at 841-42. An ALJ need not elaborate in intricate detail the evaluation of every item in the record, but only allow a reviewing court to "trace the path of the ALJ's reasoning." *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996).

In terms of Mr. Schiller's seizure frequency, he argues that the ALJ was required to determine the frequency of his seizures. But an ALJ is not required to consult a medical expert where the record is adequate to render a decision. *Skarbek*, 390 F.3d at 504; 20 C.F.R. § 404.1527(f)(2)(iii). Here, the record was adequate. In support of this argument the Plaintiff cites *Boiles v. Barnhart*, 395 F.3d 421, 426 (7th Cir. 2005). In *Boiles*, the Seventh Circuit found fault with the ALJ's determination because the testimony of the treating physician and the two non-treating physicians did not support his determination that the plaintiff did not meet a disability requirement. *Id.* at 425. Additionally, the record did not support the ALJ's findings, and he failed to explain why the testimony of the treating physician was rejected. *Id.* at 426. Ultimately, the court in *Boiles* remanded the case due to the lack of evidentiary support for the

ALJ's decision. *Id.* ("At the very least, the ALJ was obligated to solicit more evidence if he believed that the frequency of the seizures, as reflected in the record, was unclear.").

Here, unlike in *Boiles*, the ALJ clearly explained what evidence she found credible and what evidence she afforded little weight. ALJ stated that she considered the testimony of Mr. Schiller, his father and his fiancé but gave greater weight to the medical evidence and certain opinions; she also gave little weight to the opinion of Dr. Frank for the reasons discussed above. (R. 23-24). While Plaintiff claims Dr. Frank's opinion that the Plaintiff lost consciousness during seizures should be given great weight, the doctor was unable to provide any example of even one instance. (R. 645). The ALJ instead relied on the non-treating State physicians and explained that these opinions were consistent with the medical evidence as a whole. (R. 24). Most importantly, the ALJ took the seizures and other medical issues that Mr. Schiller complains of into account, finding a severe impairment, but not a disabling one. (R. 27). As a result, she found that Mr. Schiller's ability to work was limited to light work with additional restrictions. (R. 27).

The argument that the ALJ did not take into account the side effects of Mr. Schiller's medications and headaches when determining his RFC is simply untrue. As previously mentioned, when reviewing the ALJ's decision "we give the [ALJ's] opinion a commonsensical reading rather than nitpicking at it." *Shramek*, 226 F.3d at 811. The ALJ listed the claimant's medications, listed the side effects as "feelings of being disoriented and lethargic," and finally stated that her residual functional capacity assessment "takes into consideration these side effects." (R. 25).

Further, Dr. Frank assessed that Mr. Schiller's headaches "can interfere with his attention and concentration when performing even simple work tasks." (R. 26, 644-45). As previously

mentioned, the ALJ explicitly stated, following a lengthy discussion, that she afforded Dr. Frank's opinion little weight. Thus, the requirements that Dr. Frank stated in his report, the side effects of the medication, and the headaches did have a bearing on her decision, just not as great of a bearing as Mr. Schiller would like.

### 3.

Mr. Schiller's final point of contention lies with the ALJ's determination of his credibility under SSR 96-7p. As with his previous arguments, Mr. Schiller points to many reasons as to why the ALJ erred in this aspect of her decision. "The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (citing *Castile v. Astrue*, 617 F.3d 923, 928-29 (7th Cir. 2010)). A reviewing court may reverse an "ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)).

The courts have also recognized that applicants for disability benefits have an incentive to exaggerate their symptoms, and an ALJ is free to discount the applicant's testimony on the basis of the other evidence in the case. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). Therefore, when determining whether the ALJ's credibility finding is "patently wrong" we look to whether the ALJ's reasons for discrediting testimony are unreasonable or unsupported. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). An ALJ considers certain subjective evidence when assessing a claimant's credibility. *See* SSR 96-7p (requiring ALJ to consider a claimant's statements as to: daily activities; location, frequency, duration, and intensity of pain or other symptoms; factors that precipitate and aggravate those symptoms; *Rice*, 384 F.3d at 371 (same). They must also justify the credibility finding with specific reasons supported by the record.

*Terry*, 580 F.3d at 477; *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Here, the ALJ did exactly that; she provided reasons why she did not fully credit Mr. Schiller's complaints. Thus, she did not err in her credibility assessment.

The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment. Mr. Schiller's primary criticism is with this "boilerplate language." The Seventh Circuit criticized the use of this language as getting it backward by implying that the "ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2010). However, Mr. Schiller fails to note that prior to this statement the ALJ analyzed Mr. Schiller's complaints and testimony, and the testimony of his father and fiancé. Following this language the ALJ goes into a lengthy discussion of why she does not find his statements fully credible, analyzing, as she is required: (1) the objective medical evidence pertaining to Mr. Schiller's seizure disorder; (2) claimant's medical treatment, or lack thereof, for his mental impairments; (3) the fact that Mr. Schiller has been clean of drugs for years; (4) his full range of daily activities; (5) the medications and side effects of those medications; and (6) the claimant's employment history contained in the record and derived from his testimony. The ALJ does not stop there with her analysis, she then moves to the reports and opinions of the medical, non-medical and State agency sources, again discussing these in detail. Then, and only then, after nearly five single-spaced pages of discussion does the ALJ conclude that "[t]he medical evidence suggests the claimant's rendition of his conditions, as it relates to the intensity, persistence and limiting effects of his impairments, is a bit exaggerated . . . as a result, I find the

residual functional capacity as I defined above to be appropriate for this case." (R. 27). This reasoning and conclusion satisfies what the Seventh Circuit requires, even though the ALJ's decision contained the "boilerplate language." *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

## CONCLUSION

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 5/2/13